IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
**Alexandria Division**

FILED

OCT 3 0 2008

CLERK, U.S. DISTRICT COURT
ALEXANDRIA, VIRGINIA

ALEXANDRA P. MURNAN, TRUSTEE, )
    **Plaintiff,** )
     )
    **v.** )       **No. 1:08cv2**
     )
STEWART TITLE GUARANTY COMPANY, )
    **Defendant** )
     )

## MEMORANDUM OPINION

This is a diversity action for breach of a title insurance policy. Plaintiff, Alexandra Murnan, in her capacity as Trustee of the Murnan Springhill Trust ("Trust"), purchased a title insurance policy ("Policy") from defendant Stewart Title Guaranty Co. ("Stewart Title") insuring the title of a property held in the Trust and identified as 1150 Springhill Road in McLean, Virginia ("Property"). In addition to serving as Trustee, Murnan was also (i) the sole holder of the right to revoke the trust and (ii) the sole beneficiary of the Trust for the duration of her life. At the time she purchased the Policy, a number of Internal Revenue Service ("IRS") tax judgments were pending against Murnan in her personal capacity. Later, she claims, a sale of the Property to a third party foundered because the IRS tax judgments against her in her personal capacity operated as liens on the Property. Murnan, as Trustee, subsequently defaulted on the mortgage payments for the Property, and the Property was sold at a foreclosure auction for an amount less than she would have received from the sale that had previously foundered.

At issue on the parties' cross-motions for summary judgment are the following questions:

1.      Whether the IRS tax liens against Murnan in her personal capacity attach as

1

liens on any property interests that Murnan holds in her personal capacity; and if so,

2.    Whether Murnan's rights to the Property, not as Trustee, but as grantor with the sole power to revoke the Trust and as sole Trust beneficiary during her lifetime, are rights to property to which the IRS tax liens attach; and if so,

3.    Whether the IRS tax liens on Murnan's rights to the Property in her personal capacity are "lien[s] on" the Property covered by the Policy; and finally, if so,

4.    Whether recovery is nonetheless barred by the Policy's exclusion for liens that are "created, suffered, assumed or agreed to by the insured claimant."

These questions have been fully briefed and argued and are now ripe for disposition.

For the reasons that follow, Murnan, as Trustee, is entitled to summary judgment on these questions.

## I

The following facts material to the resolution of the cross-motions for summary judgment are derived from the record as a whole and are undisputed.

### A.    IRS Tax Judgments against Murnan

Between 1986 and 2003, Murnan, in her personal capacity, was the subject of numerous federal tax and other judgments, including, *inter alia*, approximately thirteen tax lien judgments[1] by the IRS. The record indicates that the IRS filed Notices of Federal Tax Liens ("NFTLs") in Fairfax County Circuit Court for at least three of those tax judgments, totaling $121,746.99.[2] Each NFTL

---

[1] The thirteen IRS tax judgments were entered on or about the following dates: (i) March 26, 1986; (ii) June 11, 1986; (iii) May 1, 1987; (iv) October 16, 1991; (v) February 14, 1992; (vi) February 8, 1994; (vii) March 8, 1994; (viii) August 11, 1994; (ix) August 12, 1994; (x) August 12, 1996; (xi) March 26, 1997; (xii) October 8, 1997; (xiii) June 23, 2003.

[2] The dates of these NFTLs are: (i) March 8, 1994; (ii) August 12, 1996; and (iii) March 26, 1997. Although the record does not indicate whether the IRS also filed NFTLs for the other outstanding federal tax judgments, listed *supra* at note 1, the precise number of filed NFTLs is

states, in pertinent part, as follows:

> As provided by sections 6321, 6322, and 6323 of the Internal Revenue Code, [the IRS is] giving a notice that taxes (including interest and penalties) have been assessed against the following-named taxpayer. We have made a demand for payment of this liability, but it remains unpaid. Therefore, there is a lien in favor of the United States *on all property and rights to property belonging to this taxpayer* for the amount of those taxes, and additional penalties, interest, and costs that may accrue.

(Emphasis added). Subsequently, on January 13, 2004, the IRS sent a letter to Murnan rejecting her request for a certificate of discharge of her federal tax liens. The letter advised Murnan that the outstanding tax liens against her at that time totaled approximately $292,899.46.

## B.   Formation of the Trust and Acquisition of the Property

In January 1998, Unger Murnan, Murnan's uncle, purchased the Property for $350,000. More than three years later, on June 20, 2001, Murnan executed a written trust agreement creating the Trust. The agreement provides, in pertinent part, that:

1.   Murnan is the grantor of the Trust;

2.   the Trust is an express, *inter vivos*, revocable trust, revocable by the grantor, Murnan, at Murnan's sole discretion;

3.   "the Grantor transfers, and the trustee accepts, in trust the real property known as 1150 Springhill Road, McLean, Virginia . . . ."[3]

4.   the assets that are the subject of the Trust shall be listed in "Schedule A," a document to be attached to the agreement; and

5.   the lifetime beneficiary of the Trust is Murnan, and upon Murnan's death, the

---

not material to the issues addressed here.

[3] Despite this language that seems to indicate that the Property was the initial *res* of the Trust, both parties agree, and the undisputed evidence indicates, that Murnan never possessed legal title to the Property in her individual capacity. Moreover, despite the disparity between this language and Murnan's averment that the initial *res* was the ten dollars that Murnan deposited into the Trust on June 21, 2001, the parties agree that a trust was validly formed.

3

future beneficiaries are Murnan's three children.

On June 21, 2001, the day after executing the trust agreement, Murnan transferred $10 into the Trust. Four days later, Unger Murnan executed a deed transferring the Property to Murnan in her capacity as Trustee in exchange for $10 and Murnan's agreement, as Trustee, to assume an existing mortgage on the Property that then totaled approximately $420,905. Murnan, acting as Trustee, then recorded the Property in an appendix to the Trust agreement as a Trust asset acquired June 25, 2001.

## C.   The Mortgage, Foreclosure, and Reacquisition of the Property

In October 2001, approximately four months after forming the Trust, Murnan, acting as Trustee, executed a balloon deed of trust with First Mount Vernon Industrial Loan Association ("Mt. Vernon") increasing a prior loan[4] from $57,000 to $84,020 and using the Property to secure the increased loan. Between May and October 2002, Murnan, acting as Trustee, increased the loan through a number of modifications to the Mt. Vernon balloon deed of trust, ultimately raising the total loan amount to $216,301.80. Mt. Vernon secured one such increase by obtaining a deed of trust for the property that entitled Mt. Vernon to foreclose on the Property in the event Murnan defaulted on the loan. Thus, when Murnan subsequently defaulted, Mt. Vernon recorded the deed of trust thereby taking title to, and ownership of, the Property on November 19, 2002.

Approximately two months later, on January 23, 2003, Murnan executed a sales contract to reacquire the Property from Mt. Vernon on behalf of the Trust. In the sales contract, which included a warranty that title was free from all liens not otherwise mentioned, the parties specifically acknowledged a prior lien on the Property—namely, the original mortgage that was on the Property

---

[4] The prior loan was a construction loan obtained to refurbish the Property. The October 2001 balloon deed of trust was a means of converting that construction loan into a mortgage on the Property.

4

when Unger Murnan transferred it to the Trust—and provided that this lien would be discharged at settlement. Neither Murnan, nor Mt. Vernon mentioned the outstanding federal tax judgments against Murnan in her personal capacity.

At some point subsequent to signing the sales contract with Mt. Vernon, but prior to closing, Murnan contacted Stewart Title regarding issuance of a title insurance policy on the Property. At some point circa January 28, 2008, Stewart Title commissioned a search of the Fairfax County land records with respect to the Property and Murnan. As a result, Stewart Title learned of the IRS tax judgments and NFTLs that had been filed against Murnan in her personal capacity.

On February 14, 2003, Murnan, acting as Trustee, executed a settlement statement regarding Mt. Vernon's sale of the Property to her that provided, *inter alia*, for (i) an $819,684.08 contract sales price; (ii) payoff of the initial mortgage on the Property; (iii) cash payment to Mt. Vernon in the amount of $282,242.50; (iv) a new loan from C. W. Cobb & Associates to Murnan, secured by the Property, in the amount of $860,000; (v) cash payment to Murnan of $6,160.44, the amount of the loan in excess of the contract sales price adjusted for various settlement charges and taxes; and (vi) title insurance on the property to be issued by Stewart Title for a $4,650 premium.

At closing a week later, on February 21, 2003, Mt. Vernon delivered a general warranty deed for the Property to Murnan on behalf of the Trust. That same day, Murnan, acting as Trustee, executed a deed of trust mortgaging the Property to S. K. Matricardi and Neil I. Title for $860,000, with the noteholder listed as C.W. Cobb & Associates. Murnan then recorded the deed to the Property on February 24, 2003.

**D.      Issuance of the Policy**

On February 24, 2003, the same day Murnan recorded the deed to the Property, Stewart Title

5

issued the Policy. The Policy, delivered in Virginia, provides, in pertinent part, that:

1.  the Policy insures "against loss or damage . . . sustained or incurred by the insured by reason of," *inter alia*, "[a]ny defect in or lien or encumbrance on the title" or "[u]nmarketability of title";

2.  the Policy excludes from coverage, *inter alia*, "defects, liens, encumbrances, adverse claims or other matters [that are] created, suffered, assumed, or agreed to by the insured claimant";[5]

3.  the "insured" is defined in relevant part as the "insured named in Schedule A"; "Schedule A" lists the "insured" as "Alexandra P. Murnan, Trustee for the Murnan Spring Hill Trust"; and

4.  the Policy excepts from coverage a number of items listed in "Schedule B," including:

    a.  the new mortgage obtained on the Property upon its reacquisition from Mt. Vernon;

    b.  any taxes subsequent to 2002; and

    c.  a water main easement that Stewart Title discovered in its records searches

Stewart Title admits that it was aware of the IRS tax liens[6] against Murnan in her individual capacity at the time the Policy issued. Stewart Title further admits that it had a copy of the Trust agreement when it issued the Policy, and hence knew that Murnan was both the Trust's life beneficiary and the sole holder of the discretionary power to revoke the Trust. Stewart Title avers that, at the time it issued the Policy, it believed that the IRS tax liens against Murnan did not attach

---

[5] The Policy further defines "insured claimant" as "an insured claiming loss or damage."

[6] The record does not indicate the precise amount or status of those tax liens as of February 24, 2003, the date Murnan, as Trustee, obtained the Policy. Both parties agree, however, that at least some amount of IRS tax liens against Murnan remained unpaid as of that date and had been properly recorded against Murnan with IRS-filed NFTLs. As noted *supra* at note 2, however, the precise number and amount of those NFTLs does not affect the issues addressed here, but may be relevant to other issues, including damages.

to the Property's title because they were filed against Murnan in her personal capacity and not against Murnan in her capacity as Trustee.

**E.    The Attempted Sale**

During Summer 2003, Murnan, concerned about her ability as Trustee to meet the mortgage payments on the Property, began to seek out a buyer for the Property. On September 25, 2003, Murnan, acting as Trustee, executed a sales contract with for the Property with Krishna Tayal ("Tayal") in the amount of $1,140,000. This sales contract guaranteed that "[t]itle is to be good and marketable, and insurable by a licensed title company with no additional risk premium" and that "otherwise, the Purchaser may declare [the] Contract void . . . ." Thereafter, subsequent to signing the sales contract, but before filing the instant claim with Stewart Title, Murnan drew up a settlement statement that, although never signed, provided, in pertinent part, that Murnan (i) would pay off $279,758.72 to the IRS as part of the sale; and (ii) would accordingly have to bring $222,002.07 to the sale, rather than receive money from the sale.

Subsequent to signing the September 25, 2003 sales contract, Tayal sought to purchase title insurance for the Property from a number of title insurance companies, including Stewart Title. For its part, Stewart Title declined to insure the Property's title. This decision, according to Stewart Title, was a business judgment based on two factors: First, Stewart Title was aware that a former attorney of Murnan's, seeking to recover on a judgment for legal fees due on matters unrelated to this case, had filed suit against Murnan in her capacity as Trustee, alleging, *inter alia*, that the transfer of the Property to the Trust was a fraudulent conveyance to avoid Murnan's debts.[7] Second, Stewart Title

---

[7] Murnan and her husband subsequently satisfied their debt to the attorney on July 3, 2002, and the attorney's suit against Murnan as Trustee was thereafter dismissed.

cited its concern that the Policy's exclusions would not bar a claim by Tayal, a good faith subsequent purchaser of the Property. While it appears that Tayal did not obtain title insurance from any other insurers, the record does not disclose the identity of these other title insurance providers, whether any declined to sell a policy to Tayal, or their reasons for doing so.

Thereafter, Tayal cancelled the contract for the Property's sale. Murnan claims that Tayal's cancellation was a direct result of Tayal's inability to obtain title insurance on the Property, which, Murnan alleges, was a result of the IRS tax judgments against Murnan in her personal capacity operating as liens on the Property's title.

**F.   The Claim**

On November 4, 2003, approximately four days after the proposed settlement date for the Tayal sale, Murnan filed a claim with, and sent an accompanying email notification to, Stewart Title. The email was signed "Alexandra P. Murnan," listed the "insured" as "Alexandra P. Murnan, Trustee," and stated in pertinent part:

> I have submitted a claim online. . . . I have an owner's policy for the amount of $1,450,000.00 taken out on February 24, 2003, which covers the marketability of title, etc. . . . The property is under contract for purchase[;] . . . the settlement was to be last Friday, October, 31, and [the third party] can't get a title binder in order to close. Your Fairfax, Virginia office has declined to issue a new policy to [the] new purchaser so it has left me with no choice except to file a claim . . . .

The next day, Stewart Title sent a letter to Murnan acknowledging receipt of the claim. Approximately two weeks later, on November 21, 2003, Stewart Title sent a letter to Murnan denying the claim on the grounds: (i) that the failure of it or any other insurer to insure the Property for a third party does not render title unmarketable or otherwise prove a defect in, or lien or encumbrance on the title; and (ii) that any unmarketability of, defect in, or lien or encumbrance on

8

the Property's title that might exist would nonetheless be excluded under the terms of the Policy.

G.     **The Subsequent Foreclosure Sale**

Subsequent to Stewart Title's denial of Murnan's claim, Murnan defaulted on the Property's mortgage. Thereafter, the Property was sold at an April 16, 2004 public foreclosure auction for approximately $980,000. The October 15, 2004 accounting of the foreclosure sale provided for payments as follows: (i) $29,927.45 for various foreclosure costs; (ii) $945,579.17 to the primary mortgage noteholder; and (iii) $7,044.88 to a junior noteholder. The record indicates that the IRS did not claim or receive any of the foreclosure sale proceeds.

Murnan, acting as Trustee, subsequently filed this action against Stewart Title on January 2, 2008, seeking damages pursuant to the Policy's coverage provisions that insure against liens on, or unmarketability of, the Property. Specifically, Murnan alleges that the IRS tax liens filed against her in her personal capacity also attached to the Property, thus causing her to receive a lower price at the ultimate foreclosure sale. Stewart Title counters that the IRS liens did not attach to the Property because of the legal distinction between Murnan's rights as Trustee, which included possession of the Property's legal title, and Murnan's rights in her personal capacity. In the alternative, Stewart Title further argues that any lien that did exist on the Property's title is nonetheless excluded from coverage under the Policy. Citing the absence of any disputed material facts, both parties now seek summary judgment[8] on the question whether the Policy, issued to Murnan in her capacity as Trustee,

_____

[8] The summary judgment standard is too well-settled to require elaboration here. In essence, summary judgment is appropriate under Rule 56, Fed. R. Civ. P., only where, on the basis of undisputed material facts, the moving party is entitled to judgment as a matter of law. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). Importantly, to defeat summary judgment the non-moving party may not rest upon a "mere scintilla" of evidence, but must set forth specific facts showing a genuine issue for trial. *Id.* at 324; *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986).

provides coverage with respect to the federal tax judgments accorded against Murnan in her personal capacity.

## II

This disputed coverage question divides into four component questions. First, it is necessary to determine whether the IRS tax judgments against Murnan in her personal capacity, as evidenced by the associated NFTLs, constitute liens that attach to any property interests Murnan has in her personal capacity. If so, then it is next necessary to determine whether these liens attach to Murnan's interests in the Property, not as Trustee, but as the Trust's life beneficiary and as the sole holder of the power to revoke the Trust. If so, it is then necessary to determine whether the IRS tax liens on Murnan's personal *interests* in the Property constitute liens on the Property, notwithstanding the fact that legal title to the Property is held by Murnan in her capacity as Trustee. Finally, assuming the IRS tax liens are liens on the Property, and thus fall within the Policy's coverage provision for such liens, it is then necessary to determine whether coverage is nonetheless barred by the Policy's exclusion for liens created, suffered, assumed, or agreed to by the insured.

Each of these questions is separately addressed.

## A.    The IRS Tax Judgments Are Liens on Murnan's Property Rights

The first question is relatively easily answered, as it is governed by statute. The Internal Revenue Code ("IRC") governs the effect of federal tax deficiency judgments on taxpayers' property rights. In this regard, the IRC mandates, as follows:

> If any person liable to pay any tax neglects or refuses to pay the same after demand, the amount . . . shall be a lien in favor of the United States upon all property and rights to property, whether real or personal, belonging to such person.

26 U.S.C. § 6321. The IRC further provides that

> the lien imposed by § 6321 shall arise at the time the assessment is made and shall
> continue until the liability for the amount so assessed (or a judgment against the
> taxpayer arising out of such liability) is satisfied or becomes unenforceable by reason
> of lapse of time.

26 U.S.C. § 6322.[9] Accordingly, when a taxpayer fails to pay a federal tax assessment, Congress

"aims to reach 'every species of right or interest protected by law and having an exchangeable

value.'" *Drye v. United States*, 528 U.S. 49, 56 (1999) (quoting *Jewett v. Comm'r*, 455 U.S. 305, 309

(1982)).

From these IRC provisions, it follows that the IRS tax deficiency judgments against Murnan,

as evidenced by the related NFTLs, constituted liens against any real or personal property rights

belonging to Murnan. These liens arose at the time of the tax assessments and were in effect at all

times relevant here, including the date the Policy issued (February 24, 2003) and throughout the

period Murnan, as Trustee, was seeking to sell the Property (Summer and Fall 2003). The question,

then, is whether Murnan, in her personal capacity, had interests in the Property that constituted

"property" or "rights to property" to which the federal tax liens attached.

**B.      The IRS Tax Liens Attach to Murnan's Rights to the Trust Property**

The second question requires more analysis because this is not the typical case. In the typical

---

[9] It is true that § 6323 requires that notice be filed pursuant to state law in "form and content . . . prescribed by the [IRS] Secretary" before a lien imposed by § 6321 is "valid as against any purchaser, holder of a security interest, mechanic's lienor, or judgment lien creditor . . . ." 26 U.S.C. § 6323 (f), (a). The import of § 6323, of course, is not on whether a lien *exists* pursuant to § 6321; rather, the lien exists pursuant to § 6322, consistent with the plain language of § 6322, "at the time the [unpaid] assessment is made," and § 6323 is only pertinent to a determination of the *priority* of the lien vis-à-vis third parties who also possess an interest in the property. In any event, the NFTLs filed here by the IRS in Fairfax County serve to satisfy the requirements of § 6323 insofar as those requirements are relevant here.

case, the delinquent taxpayer owns—has legal and equitable title to—real property. In such a typical case, the effect of §§ 6321 and 6322 is clear: Once the tax is assessed or a tax deficiency judgment is entered against the taxpayer, federal law imposes an automatic lien on the taxpayer's property—that is, the property as to which the taxpayer holds legal and equitable title. Yet, where, as here, the taxpayer does not possess legal title to a property, but instead has a *right* or *set of rights* in that property, an appropriate interpretation of § 6321 requires a two-step inquiry. First, a court must "look . . . to state law to determine what rights the taxpayer has in the property . . . ." *Drye*, 528 U.S. at 58.[10] Then, a court must consult "federal law to determine whether the taxpayer's state-delineated rights qualify as 'property' or 'rights to property' within the compass of [§ 6321]." *Id.*

Murnan's state-law rights to the Property fall into three distinct categories: (i) Murnan's rights as Trustee, (ii) Murnan's rights as the lifetime beneficiary of the Trust, and (iii) Murnan's rights as the Trust grantor with the sole power to revoke the Trust. As explained below, although Murnan's state-law rights as Trustee are insufficient to constitute "rights to property" pursuant to § 6321, Murnan's *personal* state-law rights to the property—namely, her rights as lifetime beneficiary of the Trust and as sole holder of the power to revoke the Trust—are sufficient to constitute "rights to property" to which a § 6321 federal tax lien attaches.

First, it is clear that Murnan's rights as Trustee do not constitute "property" or "rights to property" to which the federal tax liens attach. This is so because in Virginia, as elsewhere, a trustee

---

[10] Because this is a diversity action, it is axiomatic that questions of state law are governed by the forum state's law, including the forum's choice-of-law rules. *Klaxon Co. v. Stentor Elec. Mfg. Co.*, 313 U.S. 487, 496 (1941). In an insurance contract dispute, Virginia's choice-of-law rules dictate that "generally, the law of the place where [the] contract is written and delivered controls issues as to its coverage." *Buchanan v. Doe*, 246 Va. 67, 70 (1993). Here, there is no dispute that the Policy was delivered in Virginia; thus, Virginia law governs issues of interpretation and breach of the Policy.

possesses mere *legal*, not equitable, title to trust property, and thus a trustee's personal creditors may

not reach trust property.[11] Were the law otherwise, the trust device would lose most of its utility as

a means of safeguarding property,[12] as no entity could serve as a trustee without exposing trust

property to that entity's creditors.

Just as it is clear that a trustee's personal creditors may not reach trust property, it is equally

clear that a person's beneficial or equitable rights to trust property are rights to property within the

reach of that person's creditors, even if that person is also the trustee. Thus, because Virginia law

recognizes that Murnan has substantial personal and equitable rights in the Property as a lifetime

beneficiary of the Trust and grantor with the power to revoke the Trust, her individual rights *are*

sufficient to constitute "rights to property" pursuant to § 6321. This is so because, as the Supreme

Court observed in *Drye*, the touchstone of the § 6321 inquiry into the taxpayer's state-law interests

in the relevant property is the "breadth of the control the [taxpayer] could exercise over the

property." *Drye*, 528 U.S. at 61 (quoting *Morgan v. Comm'r*, 309 U.S. 78, 83 (1940)) (alteration in

original). Indeed, as the Supreme Court has more recently noted, "[i]n looking to state law, [courts]

---

[11] *See* Restatement (Third) of Trusts § 42 (2003) ("[A] trustee, *as* trustee, ordinarily takes only what is generally described as the 'bare' legal title to the trust property. . . . [Thus,] the trustee's personal creditors . . . may not reach either the trust property or the trustee's nonbeneficial interest therein." (Emphasis in original)); *see also Freed v. Judith Realty & Farm Prod. Corp.*, 201 Va. 791, 797 (1960) (noting that the creation of a trust functions to "separate[] equitable interests in the [trust property] from the [property's] legal title"); *accord Cody v. United States*, 348 F. Supp. 2d 682, 693 (E.D. Va. 2004) (citing *Ballard v. McCoy*, 247 Va. 513, 517 (1994) ("No trust can arise while the settlor retains both the full equitable interest and legal title in the trust property, since an essential characteristic of a trust is that the settlor effects the separation of these interests in the trust property.")).

[12] *See* Restatement (Third) of Trusts § 27 cmt. b(1) (describing "[c]ommon motivations" for creation of express private trusts, including, *inter alia*, "the saving of taxes and the insulation of trust property from the claims of beneficiaries' creditors").

must be careful to consider the *substance* of the rights state law provides, not merely the labels [a] [s]tate gives [those] rights or the conclusions it draws from them." *United States v. Craft*, 535 U.S. 274, 279 (2002) (emphasis added). Accordingly, where a taxpayer possesses "the unqualified right to receive the entire value of [the subject property]," the "control rein he h[olds] under state law . . . [is] rendered . . . 'property' or 'rights to property' belonging to him within the meaning of § 6321, and hence subject to [a] federal tax lien[] . . . ." *Drye*, 528 U.S. at 61 (citing *United States v. Nat'l Bank of Commerce*, 472 U.S. 713, 725 (1985)).

First, Murnan's rights as sole beneficiary of the Trust for her lifetime plainly qualify as "rights to property" to which a § 6321 tax lien may attach. Although Murnan, as Trustee, held only bare legal title to the Property, Murnan owned a beneficial life estate in the Property in her personal capacity and hence she held equitable title to the Property to this extent. *See Ballard v. McCoy*, 247 Va. 513, 517 (1994) (trustee beneficiary holds equitable title to trust property). And this equitable interest, under then-controlling Virginia law, could be reached by her creditors, including, of course, the IRS. Virginia Code § 55-19, now repealed, but in effect when the Trust was established,[13] provided as follows:

> Except as otherwise provided [for spendthrift trusts], all trust estates shall be subject to the debts and charges of the persons who are beneficiaries of such trusts as if those persons owned a similar interest in the trust estate.

Va. Code § 55-19(A), *repealed by* 2005 Va. Acts, ch. 935, effective July 1, 2006. Thus, it is clear

---

[13] Although Virginia repealed § 55-19 when it enacted the Uniform Trust Code ("UTC") in 2005, § 55-19 nevertheless controls here because (i) in Virginia the applicable law at the time of the Trust's creation controls and (ii) Virginia's enactment of the UTC was not intended to affect events, such as attachment of liens, that occurred before the UTC's passage. *See McGehee v. Edwards*, 268 Va. 15, 19–20 (2004); Va. Code § 55-551.06(5) (2006) (providing that "[a]n act done before July 1, 2006, is not affected" by enactment of the UTC).

that Murnan's beneficial life estate in the Property, which she held in her personal capacity, constitutes a "right[] to property" under IRC § 6321 to which the federal tax liens against Murnan in her personal capacity would attach.

Similarly, Murnan's personal rights to the Property as the Trust grantor with the sole power to revoke the Trust also constitute "rights to property" pursuant to § 6321. This is so because in Virginia, "when [a] trust is revocable, the grantor retains a right to withdraw the [trust] property from the trust in accordance with the terms specified by the trust agreement . . . ." *Austin v. City of Alexandria*, 265 Va. 89, 95 (2003) (citing *Cohn v. Cent. Nat'l Bank of Richmond*, 191 Va. 12, 19 (1950)).[14] Distilled to its essence, a grantor who retains the sole discretionary power to revoke the trust owns the right to eliminate the trust and thereby own the trust property outright any time she chooses to do so.[15] Understandably, therefore, although there is no Virginia case in point, commentators agree that modern trust law "conclude[s] that the [grantor] of a revocable trust should be treated as the virtual owner of the trust property, especially insofar as the rights of creditors are

---

[14] *Austin* further specifies that the grantor's right to revoke must also be in "accordance with . . . the recorded deed conveying the property to the trust." 265 Va. at 95. *Austin*, however, involved a "land trust" formed pursuant to Va. Code § 55-17.1. *Id.* Here, neither party argues that the Trust was a "land trust"; rather, both parties agree that the trust in question was a general, revocable *inter vivos* trust that could—and did—possess many different types of property as Trust property. In any event, the Property's recorded deed places no restrictions on Murnan's right as grantor to revoke the Trust at any time.

[15] Nor is this conclusion altered by the existence of the Murnan children's future beneficial rights to the Property. The Trust places no restrictions on Murnan's right to revoke the Trust, and while Murnan, as Trustee, may owe the children a limited fiduciary duty during the life of the Trust, this duty in no way limits Murnan's power at any time to revoke the Trust, own the Property outright in her personal capacity, and thereby extinguish the children's future interest. *See Austin*, 265 Va. at 91. In *Austin*, as here, the grantor was both a life beneficiary and grantor with the sole power to revoke, and the only other interests in the trust property belonged to beneficiaries whose interest only came into existence upon the life beneficiary's death. *Id.*

15

concerned." 3 Scott & Ascher on Trusts § 15.4.2 at 961 (2006). Put differently, "a revocable *inter vivos* trust 'is ordinarily treated as though it were owned by the settlor.'" *Id.* at 961 n.19 (quoting Restatement (Third) of Trusts §25(2) (2003)). Accordingly, a grantor's right to revoke a trust and thus acquire equitable as well as legal title to trust property, clearly qualifies as a "right[] to property" to which an IRS lien attaches.

In sum, Murnan's rights to the Property as lifetime beneficiary of the Trust and grantor with the sole power to revoke the Trust are "rights to property" to which a federal tax lien attaches pursuant to IRC § 6321. And although there is no case directly in point on the question presented here, the analogous authority supports the result reached here. For example, this result is consistent with the Supreme Court's treatment of the taxpayers' state-law rights at issue in *Drye* and *Craft*. In *Drye*, the Supreme Court held that an heir or devisee's right, under Arkansas law, to take or disclaim an inheritance estate constituted "property" or "rights to property" pursuant to § 6321. *Id.* at 60-61. As a result, the federal tax lien attached at the moment the heir or devisee obtained the right to disclaim or take, even though the particular heir in question chose to disclaim the estate and channel it to his daughter. *Id.* at 61. The manner in which the heir exercised his right was irrelevant, as the "power to channel [an] estate's assets warrants the conclusion that [the heir] held 'property' or a 'right to property' subject to the [IRS tax] liens." *Id.*[16] Further, in *Craft*, the Supreme Court found

---

[16] *See also Goldstein v. United States*, No. 1:91cv0969, 1992 WL 402944 (N.D. Ohio Sept. 2, 1992). In *Goldstein*, a grantor-taxpayer created an *inter vivos* revocable trust that, by the terms of the trust, became irrevocable at the grantor's death. *Id.* at *1. Subsequent to the grantor's death, the IRS issued a notice of assessment for unpaid taxes on the grantor-taxpayer. *Id.* at *3. The IRS then sought to enforce its § 6321 lien against the trust property via administrative levy. *Id.* The court held, "Once the trust became irrevocable, the trust *res* became separate property, and legal title to the trust assets no longer was, or could be, owned by the [grantor] or his estate. . . . Thus, the [grantor-taxpayer] owned no property rights in the trust assets at the time the IRS issued its notice of assessment." *Id.* Although *Goldstein* did not address

16

that a spouse's right in land owned as a tenant by the entirety under Michigan law was sufficient to

constitute "property" or "rights to property" under § 6321. *Craft*, 535 U.S. at 283. There, the

Supreme Court noted that the taxpayer spouse had, *inter alia*, the following rights:

> the right to use the property, the right to exclude third parties from it, the right to a
> share of income produced from it, the right of survivorship, the right to become a
> tenant in common with equal shares upon divorce, the right to sell the property *with
> the [other spouse's] consent* and to receive half the proceeds from such a sale, the
> right to place an encumbrance on the property *with the [other spouse's] consent*, and
> the right to block [the other spouse] from selling or encumbering the property
> unilaterally.

*Id.* at 283 (emphases added).

Here, Murnan's rights in the Property are, at minimum, equivalent to those held by the

taxpayer in *Drye*; moreover, Murnan's rights are clearly less restricted than those of the taxpayer in

*Craft*.[17] In any event, it is clear that Murnan's personally-held rights—as life beneficiary and as

grantor with the sole right to revoke the Trust—constituted "property" or "rights to property" to

which the IRS tax liens attached pursuant to § 6321.

**C.     The Policy Covers the IRS Tax Liens**

The third question—whether the Policy covers the IRS tax liens that attached to Murnan's

---

the effect of § 6321 to a grantor-taxpayer in the context where taxes are assessed before a trust or
created or while a trust is still revocable by the grantor, it did base its denial of the IRS's
argument for attachment on the trust having become *irrevocable*, thus implying that it would
have reached a contrary result had the assessment been made, as here, prior to the trust becoming
irrevocable.

[17] The result here is also consistent with *United States v. Bess*, 357 U.S. 51 (1958), which
interpreted § 6321's predecessor statute, formerly 26 U.S.C. § 3670 of the 1939 Internal Revenue
Code. In *Bess*, the Supreme Court determined that while the insured under a life insurance policy
*did not* have sufficient state-law rights in the *proceeds* of the policy such that a federal tax lien
attached to those *proceeds*, the insured *did* have a sufficient state-law right in the *cash surrender
value* of the policy such that a federal tax lien *did* attach to that cash surrender value. 357 U.S. at
55-56 (interpreting New Jersey property rights).

personal rights to the Property—is governed by the Policy's terms. In this regard, the Policy insures, in pertinent part, against loss resulting from "[a]ny . . . lien . . . on the [Property's] title."[18] And although the Policy does not define "lien," the settled meaning of that term under Virginia law is a "liability *in rem*"—in other words, a right that a creditor has against its debtor's property. *Fairbanks, Morse & Co. v. Town of Cape Charles*, 144 Va. 56, 61 (1926).[19] Thus, the question is whether the IRS tax liens against Murnan in her personal capacity, which are clearly liens on Murnan's *rights* to the Property, are "liens" on the Property itself, notwithstanding the fact that the Property's legal title is held by Murnan as Trustee. Put differently, the question is whether the creditor—here, the IRS—has, by virtue of its lien on Murnan's personal property rights, a right to the Property as well. As explained below, because of the breadth of Murnan's personal rights to the Property and state law's treatment of a lien on those rights as a lien on the property itself, the IRS tax liens here function as liens on the Property sufficient to trigger the Policy's coverage.[20]

---

[18] The terms "encumbrance" and "defect," also included in the pertinent coverage provision, are simply broader terms that include "lien" within their definitions. An "encumbrance," as applied to property, includes "every right to, or interest in, . . . land, to the diminution of the value of the land, but consistent with the passage of [title to that land] by [a] conveyance." *Sterling v. Blackwelder*, 302 F. Supp. 1125, 1127 (E.D. Va. 1968) (quoting 1 Michie's Jurisprudence, Covenants § 25). Moreover, although no case applying Virginia law has explicitly defined what constitutes a "defect in title," a defect, like an encumbrance, is simply a broad term that refers in a general sense to problems, such as liens, that affect a property's title. *See United Fire & Cas. Co. v. Fidelity Title Ins. Co.*, 258 F.3d 714, 719 (8th Cir. 2001) (applying Minnesota law) ("While courts use many terms to describe flawed titles, and the various types of flaws in title . . . , the term "defect" itself is typically used in a broader sense that encompasses all the other terms.").

[19] *See also Mich. Mut. Ins. Co. v. Smoot*, 129 F. Supp. 2d 912, 918 (E.D. Va. 2000) (citing *Black's Law Dictionary* 922 (6th ed. 1990)) (applying Virginia law in defining "lien" as "a property right; . . . an encumbrance or charge on property that belongs to another").

[20] Murnan also contends that the coverage provision insuring against loss resulting from "unmarketability of the [Property's] title" entitles her to coverage. As discussed *infra* at note 36,

First, the Fourth Circuit has already applied Virginia law to an analogous situation and found that a lien filed against an individual who holds a combination of rights to trust property similar to those held here by Murnan is also a lien on the trust property itself. Specifically, in *Bluff Ventures Limited Partnership v. Chicago Title Insurance Co.*, the Fourth Circuit addressed a similar lien provision[21] in a title insurance policy for a property held in trust[22] and found that when a beneficiary's creditor obtains a judgment lien against that beneficiary as an individual, that lien "becom[es] a lien on the [trust] property on the date the judgment [i]s recorded." 950 F.2d 139, 145 (4th Cir. 1991) (citing *Coutts v. Walker*, 29 Va. 268, 281 (1830); *Hutchinson v. Maxwell*, 100 Va. 169, 179 (1902)) (applying Va. Code § 55-19). The insurer in *Bluff Ventures* sought to avoid coverage, as Stewart Title does here, on the basis that the legal title to the insured property was held by trustees, whereas the liens in question had been filed against certain trust beneficiaries as individuals. *Id.* at 144. According to the Fourth Circuit, however, "[t]hat the legal title to the property involved was held by trustees is not determinative as to whether the judgment [against the beneficiaries] was a lien on the [trust] property." *Id.* (citing *Coutts*, 29 Va. at 281). Instead, the judgment lien against the individual beneficiary was also a "lien on the [trust] property." *Id.* at 146. Moreover, the Fourth Circuit held in the alternative that the combined power of the trustees in *Bluff Ventures* to "terminate[] the trust or convey[] the property either to themselves, as individuals, or to

---

however, the record is insufficiently clear at this time for a determination as to whether the unmarketability provision is triggered here.

[21] The applicable provision in *Bluff Ventures* "insured against loss by reason of liens or encumbrances on the [insured] property . . . ." 950 F. 2d at 143.

[22] Unlike here, where the Policy is an "owner's policy," the policy in *Bluff Ventures* was a "lender's policy." *Bluff Ventures*, 950 F.2d at 144. This difference, however, is not material to the scope of the two policies' coverage for liens on title.

a third party" vested in them sufficient power over the trust property that judgment lien creditors could reach the property itself. 950 F.2d 139 at 145 (citing *Jones v. Conwell*, 227 Va. 176, 183 (1984)). As the Fourth Circuit noted, "since [the individuals subject to the judgment lien] could reach the trust property, [the judgment creditor] was entitled to subject their interest in the trust property to the payment of its judgment." *Id.* Although the trustees' power in *Bluff Ventures* was not a grantor's right to revoke a revocable trust, the scope of that power was essentially the same as Murnan's right to revoke: the trustees could reach the property and choose to own it in their personal capacity. Thus, by virtue of its lien on Murnan's personal rights in the Property, the IRS, like the creditor in *Bluff Ventures*, had a right that created a lien on the Property and thereby triggered the Policy's coverage.

Stewart Title seeks to avoid this result by arguing that until the IRS seeks to *enforce* its liens against Murnan's *individual interests* by initiating some sort of action against the *Property*,[23] the IRS liens against Murnan's personal interests in the Property do not then attach to the Property itself. This argument, however, misapprehends the question presented. The IRS's failure to *enforce* its liens on the Property does not mean that *no such liens existed* on the Property. As defined in Virginia law, a "lien on" title is merely a creditor's *right* to property; that creditor need not seek to *enforce* its rights for those rights to function as a "lien on" the property. Moreover, Stewart Title's argument, if accepted, would lead to an absurd result: an insurance policy designed to protect against creditors'

---

[23] It is true, of course, that the United States has "a number of distinct enforcement tools available . . . for the collection of delinquent taxes." *United States v. Rodgers*, 461 U.S. 677, 682 (1983). Indeed, the United States "may, for example, simply sue for the unpaid amount, and on getting a judgment, exercise the usual rights of a judgment creditor." *Id.* (citing 26 U.S.C. §§ 6502(a), 7401, and 7402(a)). In addition, the federal government may, pursuant to 26 U.S.C. § 6331, institute an administrative levy action against a property or, pursuant to 26 U.S.C. § 7403, seek judicial sale of property in which a taxpayer has an interest. *Id.*

rights to property would provide coverage not when those rights come into being—here, pursuant to § 6322, when the tax deficiency is assessed—but rather when the IRS chose, at its discretion, to seek *enforcement* of *already-existing* liens.[24]

Stewart Title further argues that this finding disregards the state-law protection given to trusts. In other words, Stewart Title argues that by permitting attachment of liens against a beneficiary-grantor's rights in a property to the title of property held in trust, federal law impermissibly "pierces the trust veil" and ignores a state-law device that was designed to insulate against such attachments. But Stewart Title's argument mischaracterizes the nature of Virginia's state-law treatment of trust property. While a trust under Virginia law may serve in various ways to safeguard trust property, Virginia law does not immunize trust property from the reach of a beneficiary's judgment creditor. Thus, Virginia law does *not* protect the Property from creditors' liens on Murnan's rights as beneficiary and grantor. Put differently, attachment of a federal tax lien pursuant to § 6321 does not "pierce" or otherwise disregard any state-law protection; rather, the attachment of the § 6321 lien to the Property is entirely consistent with Virginia law. *See Bluff Ventures*, 950 F.2d at 144.[25] Accordingly, the Policy's coverage provision for liens on the Property

---

[24] Stewart Title cites *Stophel v. United States*, No. 1:79cv166, 1981 WL 1869 (E.D. Tenn. June 16, 1981), in support of this argument. In *Stophel*, a deficient taxpayer corporation was held to have fraudulently transferred property in fee simple to a third party prior to the assessment of a § 6321 lien against the taxpayer, and the IRS subsequently filed NFTLs against the third party as a nominee of the deficient taxpayer. *Id.* at *1–3, 5–6. Stewart Title argues that it follows from the procedural posture of *Stophel* that the IRS tax liens against Murnan in her personal capacity do not attach to the Property until the IRS files an NFTL against either Murnan, in her capacity as Trustee, or otherwise takes action against the Property itself. The IRS's filing of the NFTLs in *Stophel*, however, was relevant to the *priority* of various liens on the property in that case, *not* to whether a § 6321 tax lien *existed*. *Id.* at *5–9. In any event, insofar as *Stophel* suggests a result contrary to that reached here, it is unpersuasive.

[25] Moreover, Stewart Title also misapprehends the federal-law supremacy of § 6321 as

21

applies.

**D.    The Policy's Exclusion Does Not Bar Coverage**

Given the conclusion that the IRS tax liens against Murnan in her personal capacity fall

within the Policy's coverage, it is necessary to address whether any Policy exclusion bars recovery.

Here, Stewart Title's argument focuses on a single exclusion. That exclusion ("Exclusion"), in

pertinent part, excludes from coverage those damages "which arise by reason of . . . liens . . . created,

suffered, assumed, or agreed to by the insured claimant." The Policy further defines the "insured

claimant" as the "insured claiming loss or damage," and the "insured," in relevant part,[26] as "the

insured named in Schedule A." Finally, Schedule A lists the "Name of Insured" as "Alexandra P.

Murnan, Trustee for the Murnan Spring Hill Trust."

As explained below, in a typical case, where a person owns property outright in the absence

of a legal device such as a trust, this Exclusion would operate to bar coverage where a lien exists on

a property by virtue of the owner's failure to pay IRS tax assessments. But again, this is not the

typical case. Here, the IRS tax liens were assessed against Murnan in her personal capacity, whereas

---

discussed in both *Drye* and *Craft*, where § 6321 *federal* liens existed on property *notwithstanding*
a state-law protection of such property from creditors. Here, however, Virginia law provides no
such insulation to the Trust Property. Accordingly, it is not necessary for § 6321 to disregard any
state law.

[26] The Policy's definition of the "insured" reads as follows:

> [T]he insured named in Schedule A, and, subject to any rights or defenses
> [Stewart Title] would have had against the named insured, those who succeed to
> the interest of the named insured by operation of law as distinguished from
> purchase including, but not limited to, heirs, distributees, devisees, survivors,
> personal representatives, next of kin, or corporate or fiduciary successors.

Neither party argues, nor do the facts indicate, that anyone has "succeed[ed] to the
interest of the named insured by operation of law."

22

the Policy defines the relevant actor for purposes of the Exclusion—the "insured"—as "Alexandra P. Murnan, Trustee for the Murnan Spring Hill Trust." Thus, the Exclusion raises two questions here. First, it is necessary to determine whether the Exclusion's definition of the "insured" adopted a distinction between Murnan's actions in her capacity as Trustee and Murnan's actions in her personal capacity, thereby limiting the relevant actions for purposes of the Exclusion to her actions as Trustee. If not, then Murnan's actions in her personal capacity are relevant for purposes of the Exclusion, and because she clearly "suffered" the IRS tax liens in her personal capacity, the Exclusion would bar coverage. If, on the other hand, the Exclusion *does* limit its scope to Murnan's conduct as Trustee, then it is necessary to determine whether Murnan, as Trustee, "created, suffered, assumed, or agreed to" the liens on the Property.

Under Virginia law, it is well-settled that "[c]ourts interpret insurance policies, like other contracts, in accordance with the intention of the parties gleaned from the words they have used in the document." *Floyd v. N. Neck Ins. Co.*, 245 Va. 153, 158 (1993), *quoted in Transcon. Ins. Co. v. RBMW, Inc.*, 262 Va. 502, 512 (2001). But it is also true that "[e]xclusionary language in an insurance policy [is] construed most strongly against the insurer." *Am. Reliance Ins. Co. v. Mitchell*, 238 Va. 543, 547 (1989) (citing *Johnson v. Ins. Co. of N. Am.*, 232 Va. 340, 345 (1986)). Thus, it is axiomatic that ambiguous exclusionary language, or language that "may be understood in more than one way or when it refers to two or more things at the same time," should be read in favor of granting coverage. *Am. Reliance*, 238 Va. at 547 (citing *Lincoln Nat'l Life Ins. Co. v. Commonwealth Container Corp.*, 229 Va. 132, 136–37 (1985); *St. Paul Ins. v. Nusbaum & Co.*, 227 Va. 407, 411 (1984)), *quoted in Granite State Ins. Co. v. Bottoms*, 243 Va. 228, 234 (1992).[27]

---

[27] Similarly, an insurer bears the burden of proving that an exclusionary provision in an

With respect to the Policy's definition of the "insured" as "Alexandra P. Murnan, Trustee of the Murnan Spring Hill Trust," it is clear that the Policy's definition of the "insured" makes a direct *reference* to Murnan's capacity as Trustee. The *import* of that reference, however, is unclear. Specifically, it is unclear whether the Policy's definition of "insured" should be interpreted as "Alexandra P. Murnan, [*who is*] Trustee for the Murnan Spring Hill Trust" or whether that reference should be interpreted as "Alexandria P. Murnan, [*acting in her capacity and only in her capacity as*] Trustee for the Murnan Spring Hill Trust." The former construction interprets the Policy's reference to Murnan's role as Trustee as merely identifying information that was not intended to limit the Exclusion to Murnan's actions taken in her role as Trustee. The latter construction, on the other hand, interprets the Policy's reference to Murnan's role as Trustee as doing precisely that, namely limiting the Exclusion's scope to Murnan's acts as Trustee. Thus, because the Policy's language defining the "insured" is susceptible to two differing constructions, one barring coverage and the other not barring coverage, the language is ambiguous. As a result, settled Virginia law requires that the ambiguity must be strictly read against the insurer, and the construction effecting coverage must be adopted.[28] Thus, the Policy's definition of the "insured" as "Alexandra P. Murnan, Trustee for the Murnan Spring Hill Trust" must be construed here to limit the relevant actions for purpose of the

---

insurance contract functions to bar coverage. *Town Crier, Inc. v. Hume*, 721 F. Supp. 99, 101 (E.D. Va. 1989) (citing *Johnson*, 232 Va. at 345).

[28] *See Lincoln Nat'l Life*, 229 Va. at 136–37 (term in insurance policy is ambiguous, and thus read in favor of coverage, when it is "susceptible of two constructions"); *Caldwell v. Transp. Ins. Co.*, 234 Va. 639, 642–43 (1988) (citing *St. Paul Ins.*, 227 Va. at 411–12) (same for insurance policy exclusion); *see also Greenbaum v. Travelers Ins. Co.*, 705 F. Supp. 1138 (E.D. Va. 1989) (ambiguous "named insured" in an automobile policy construed against the insurer).

24

Exclusion to Murnan's actions as Trustee.[29]

In response, Stewart Title contends that this interpretation is inconsistent with the result, reached *supra*, that the IRS tax liens against Murnan in her personal capacity attach to the Property notwithstanding the distinction between Murnan's rights as Trustee and Murnan's rights in her personal capacity. Essentially, Stewart Title argues that if the distinction does not function to prevent attachment of the IRS tax liens, the definition of "insured" should not be interpreted to adopt that distinction for purposes of the Exclusion. But this argument misses the mark; the two issues are quite distinct, and there is no reason the resolution of one should control the resolution of the other. Whether the federal tax liens attach to the Property is chiefly a question governed by state and federal law. By contrast, whether the Exclusion applies is chiefly a question of Policy interpretation. The mere fact that the legal distinction between Murnan as Trustee and Murnan in her personal capacity does not *function* to protect the Property's title from Murnan's personal IRS tax liens does not mean that the legal distinction does not exist and cannot be adopted in the Policy. In short, although the Trust's formation did not prevent attachment of the IRS tax liens to the Property, the Trust's formation nonetheless still created a valid legal device.[30]

Importantly, Stewart Title had ample opportunity to avoid this result by crafting an Exclusion

---

[29] It is worth noting that although the Policy's definition of "insured claimant" is ambiguous here, the result may not be the same where, unlike here, there is clear evidence of contemporaneous mutual intent of the parties that the provision be interpreted in a particular manner. *See Town Crier*, 721 F. Supp. at 101 (observing that although, as a general rule, ambiguities in exclusions are read against the insurer, such general rules of interpretation "do not authorize a court to rewrite the policy for the parties, nor to construe a policy contrary to its plain language or to the parties' intent").

[30] It is important to observe, however, that Stewart Title has not alleged that the creation of the Trust or the acquisition of the Property on behalf of the Trust fraudulent or otherwise ineffective, in which event a different result might obtain.

that covered Murnan in both her individual and Trustee capacities. In this respect, Stewart Title knew it was contracting with the trustee of a revocable trust who, in her individual capacity, was also the life beneficiary and the grantor with a discretionary power to revoke. Thus, Stewart Title could have written the Policy to define "insured" to include Murnan's actions in her personal capacity or made specific reference to actions of the trust beneficiary and grantor in the Exclusion itself.[31] The consequence of failing to do so unambiguously—as required by Virginia law—is the result reached here.

Given that the Policy's definition of the "insured" is thus construed to include only Murnan's actions as Trustee as relevant to the Exclusion, the final question is whether Murnan, as Trustee, "created, suffered, assumed, or agreed to" the liens on the Property. And it is clear, based on the well-settled definitions of each of those four terms, that Murnan, in her capacity as Trustee, did not do so. First, because a tax lien arises by virtue of a deficient taxpayer's failure to pay an assessed tax despite the power and obligation to do so, the applicable Exclusion term for the attachment of a tax lien is "suffer." This is so because "suffer," when used in an exclusion like the one at issue, "has been interpreted to mean consent with the intent that 'what is done is to be done,' . . . and has been deemed synonymous with 'permit,' which implies the power to prohibit or prevent the claim from arising." *Am. Sav. & Loan Ass'n v. Lawyers Title Ins. Corp.*, 793 F.2d 780, 784 (6th Cir. 1986) (quoting *First Nat. Bank & Trust Co. v. N.Y. Title Ins. Co.*, 12 N.Y.S.2d 703, 709 (Sup. Ct. 1939); *Ariz. Title Ins. & Trust Co. v. Smith*, 21 Ariz. App. 371, 374 (Ct. App. 1974)).[32] Here, Murnan clearly

---

[31] *See Taussig v. Chicago Title & Trust Co.*, 171 F.2d 553, 555 (7th Cir. 1948) (title insurance policy exclusion barred coverage for "liens . . . created, suffered, or assumed by the party guaranteed *or by any beneficiary*"(emphasis added)).

[32] *See also* 11 Couch on Insurance § 159:73 at 91 (3d ed. 2005) ("[T]he term 'suffer' . . .

"suffered"[33] the lien on her personal property rights, and also on the Property, *in her personal capacity*. But because Murnan, in her capacity as Trustee, had neither the power, nor the obligation, to satisfy Murnan's personal tax liabilities,[34] she could not "suffer" the IRS tax liens in her capacity as Trustee.

Moreover, it is also clear that Murnan, in her capacity as Trustee, neither "assumed," nor "agreed to," the liens on the Property. "Assume" typically "requires knowledge of the specific title defect [alleged to be] assumed." *Am. Sav. & Loan*, 793 F.2d at 784.[35] Similarly, "agreed to" generally "carries connotations of 'contracted,' requiring full knowledge by the insured of the extent and amount of the claim against the insured's title." *Id.* Here, there is no evidence that Murnan, as Trustee, "assumed" or "agreed to" the IRS tax liens on the Property. Certainly, Murnan, acting as Trustee, *did* assume or agree to *other* liens or encumbrances on the Property's title, such as the various mortgages on the Property. But Murnan, acting as Trustee, did not specifically agree to or assume the IRS tax liens as liens on the Property.

---

impl[ies] the power to prevent or hinder, and would include knowledge of what is to be done under the sufferance and permission, and the intention that what is done is to be done."); 21A Michie's Jurisprudence, Words and Phrases at 534 (2007) ("Suffer, as a verb, means to allow; to permit; not to forbid or hinder; also, to tolerate, to put up with." (citing *Nolde Bros. v. Chalkley*, 184 Va. 553, 564 (1945) (interpreting "suffer" in a non-insurance context)).

[33] It is also clear under the Policy that Murnan did not "create" the IRS tax liens in any capacity, as "create" requires an affirmative act, whereas a tax deficiency typically arises from a failure to act. *See Am. Sav.*, 793 F.2d at 784.

[34] Indeed, it is worth noting that all but one of the federal tax liens, enumerated *supra* at note 1, were assessed before Murnan's capacity as Trustee even existed.

[35] *See also Ariz. Title*, 21 Ariz. App. at 374 ("[T]aking realty [']subject to['] an encumbrance 'does not necessarily [a]ssume a personal obligation to pay it.'" (quoting *Del Rio Land, Inc. v. Haumont*, 110 Ariz. 7, 9 (1973))); *Ticor Title Ins. Co. of Cal. v. FFCA/IIP 1988 Prop. Co.*, 898 F. Supp. 633, 639 (N.D. Ind. 1995) (citing *Am. Sav. & Loan*, 793 F.2d at 784).

Applied to the case at bar, then, the Exclusion does not operate to bar coverage for the IRS tax liens filed against Murnan in her personal capacity. In response, Stewart Title relies chiefly on *Chicago Title Insurance Co. v. Resolution Trust Corp*, 53 F.3d 899, 907 (8th Cir. 1995), and argues that the general purpose of the Exclusion—to prevent affirmative misconduct by the insured—mandates its application here. Specifically, Stewart Title points to the language in *Chicago Title* indicating that the type of "affirmative misconduct" this type of exclusion seeks to prevent includes "the insured's acting in 'positive bad faith' to divert property to its own benefit through fraud, undue influence, schemes to gain illegal profits, and breach of fiduciary duty." *Id.* Stewart Title argues that Murnan, by failing to pay her personal income taxes, engaged in the type of wrongful conduct that the Exclusion seeks to bar from coverage.

Stewart Title's argument, however, again misapprehends the nature of the question presented. First, Murnan's failure to pay her income taxes was a failure to act *in her personal capacity*, not a failure to act as Trustee. Moreover, in its attempts to paint Murnan's actions broadly as the type of conduct the Exclusion seeks to bar from coverage, Stewart Title mischaracterizes Murnan's behavior. The record does not suggest any "affirmative misconduct" by Murnan in her interactions with Stewart Title. Specifically, Murnan did not conceal from Stewart Title the existence of the Trust or its terms, nor did Murnan deny or conceal the existence of the IRS tax liens against her in her personal capacity. Rather, Murnan, as Trustee, purchased insurance for the same reason any insured does—to shift a risk to Stewart Title, someone in a superior position of expertise. That both Stewart Title and Murnan may have mistakenly believed that the IRS tax liens did not attach to the Property does not mean that either party acted in bad faith; instead, it simply shows that Murnan made a prudent business decision in seeking to insure against the risk of that mistake.

28

Moreover, Stewart Title had ample opportunity to eliminate all doubt by excepting the IRS tax liens against Murnan in her personal capacity. Indeed, with regard to potential title problems other than the IRS tax liens, it did precisely that. In Schedule B to the Policy, Stewart Title specifically excepted from coverage, *inter alia*, damages from the following: (i) a pre-existing mortgage on the Property, (ii) future tax liabilities subsequent to the year 2002, and (iii) a water main easement it discovered in its public records search. Stewart Title avers that it subjectively believed that the tax liens did not attach to the Property's title, and there is no evidence in the record to suggest otherwise. But just as Murnan, as Trustee, purchased the Policy to insure against the risk that *she* was wrong and the liens attached, Stewart Title had the opportunity to bargain for terms in the Policy to protect against the risk that *it* was wrong. With a simple keystroke, Stewart Title could have added the IRS tax liens against Murnan in her personal capacity to the list and eliminated the risk of error. It chose not to do so.

In the end, this is an odd case. As a general matter, an insurance policy is a wager that some future event or circumstance will or will not occur. In other words, a policy is, in effect, a wager over a future, uncertain event. A life insurance policy is the quintessential example; the purchaser wagers that the insured will die during the period the policy is in effect, while the insurer wagers that the insured will not do so. In this case, however, the Policy is not a wager about the occurrence or non-occurrence of some future event. Rather, Stewart Title wagered here that the federal tax liens—which it knew about—did not attach to the Property, or alternatively, were barred by the Exclusion; the insured, on the other hand, wagered to the contrary. In other words, this case is odd because the parties wagered about whether a set of facts—fully known to both parties—would fall within the Policy. Thus, the parties' wager really amounts to a wager on the legal effect of the federal

29

tax liens and the Policy Exclusion. To the extent that Stewart Title wagered that a court would ultimately hold the liens did not attach to the Property, were not covered by the Policy, or were barred by the Policy's Exclusion, it has lost that wager.

For these reasons, Murnan, as Trustee, is entitled to partial summary judgment on the issues of (i) whether the federal tax liens filed against her in her personal capacity triggered the Policy's coverage provision for liens on the Property's title and (ii) whether the Exclusion nonetheless bars coverage here.[36]

An appropriate Order will issue.

Alexandria, Virginia
October 30, 2008

T. S. Ellis, III
United States District Judge

---

[36] It is important to note the remaining issues that are not decided here. First, it is not appropriate at this time to make any determination as to proximate cause or existence of damages. It is true, of course, that the measure for damages incurred by virtue of a lien on a property's title as covered by a title insurance policy is typically "the cost of removing the liens from the property." *See MacDonald v. Lawyers Title Ins. Corp.*, Nos. 95-1219, 95-1220, 1996 WL 114719, at *7–8 (citing *Bluff Ventures*, 950 F.2d at 141–43; *Title Ins. Co. of Richmond v. Indus. Bank of Richmond*, 156 Va. 322, 332–35 (1931)). Yet, the record here is unclear as to the precise amount of the IRS tax liens on the Property at the pertinent time or whether a different measure of damages is appropriate. Similarly, the record is unclear with regard to whether the Policy's coverage provision for unmarketability of title was triggered here. Although it is clear that the proposed sale to Tayal foundered, it is also true that the Property was ultimately sold at foreclosure without any apparent concerns regarding marketability.